E-FILED
Thursday, 11 June, 2009  03:29:22 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LARRY WASHINGTON and JENNIFER A. JENKINS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.  07-3075 |
| CITY OF SPRINGFIELD, et al., | ) ) ) | |
| Defendants. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on: (1) Defendant Paul Carpenter's Motion for Summary Judgment (d/e 174) (Carpenter Motion); (2) Defendant James Graham's Motion for Summary Judgment (d/e 175) (Graham Motion); (3) Defendants City of Springfield, Welsh, Wooldridge, and Rouse's Motion for Summary Judgment (d/e 172) (City Motion); and Defendant Rickey Davis' Motion for Summary Judgment (d/e 176) (Davis Motion).  For the reasons set forth below, the Davis Motion is ALLOWED; the City Motion is ALLOWED in part and DENIED in part; the Carpenter Motion is DENIED, and the Graham Motion is DENIED.

<u>STATEMENT OF FACTS</u>

In March 2005, the individual Defendants were all police officers employed by the Springfield, Illinois, Police Department (Department). William Rouse was Deputy Chief of Police. Rickey Davis was a Lieutenant. Defendants Paul Carpenter, James Graham, S. Welsh, and J.T. Wooldridge were detectives. Rouse was in charge of Criminal Investigations. Defendants Carpenter, Graham, Welsh and Wooldridge were assigned to Criminal Investigations.

In March 2005, Plaintiffs Larry Washington and Jennifer Jenkins lived at 1429 Guemes Court, Springfield, Illinois (Residence). Washington was a convicted drug dealer and a former member of a gang called the Vice Lords. <u>Defendants' Exhibits (d/e 178) (Defendants' Exhibit)</u>, Exhibit 2, <u>Deposition of Larry Washington (Washington Deposition)</u>, at 50. Graham stated in his deposition that on March 15, 2005, he had a conversation with Alcohol, Tobacco, and Firearm (ATF) Agent John Carpenter about Washington's possible connection to a homicide investigation. <u>Defendants' Exhibit 1</u>, <u>Deposition of James Graham (Graham Deposition)</u>, at 81. John Carpenter did not recall any such conversation and was not aware of any

ongoing investigation involving Washington.[1]   Defendants' Exhibit 5, Deposition of John Carpenter (John Carpenter Deposition), at 50. Defendant Carpenter stated that on March 15, 2005, he and Graham drove by the Residence and Graham pointed out Washington to Carpenter. Defendants' Exhibit 4, Deposition of Paul Carpenter (Carpenter Deposition), at 72.  Graham agreed that the two of them drove past the Residence that day.  Graham stated initially in his deposition that he did not recall seeing Washington at that time, but later in his deposition, stated that he saw Washington at that time.  Graham Deposition, at 55, 86.

Graham stated that on the morning of March 16, 2005, Carpenter told Graham that he had observed a trash can at the curb outside the Residence. Graham Deposition, at 49.  Graham removed the trash from the can in front of the Residence.  Graham then took the trash to a different location where Graham and Carpenter searched the trash.  Id., at 53.  This type of search is referred to as a "trash pull" or "trash rip."  See Graham Deposition, at 32.  Springfield Police Chief Donald Kliment had issued an order not to perform trash rip searches.  Defendants' Exhibit 15, Deposition

---

[1]The Court refers to Defendant Paul Carpenter as "Carpenter" and to ATF Agent John Carpenter as "John Carpenter".

of Donald Kliment (Kliment Deposition), at 21-23, 55-56.  Graham and Carpenter stated that they were not aware of any such order.  Graham Deposition, at 166-67; Carpenter Deposition, at 63.  Carpenter stated that the trash rip search at the Residence occurred at 7:45 a.m.  Carpenter Deposition, at 84. Graham stated that the search occurred at 8:30 a.m.  Graham Deposition, at 51.  Graham's written report on the trash rip search stated that the trash rip search occurred at 10:00 a.m.  Plaintiffs' Memorandum of Law in Response to Defendant Carpenter's Motion for Summary Judgment (d/e 192), attached Plaintiffs' Exhibits (Plaintiffs' Exhibit), Exhibit J, Police Report dated March 21, 2005 (Police Report).  According to Graham, the "10:00 a.m." time on the report reflected the time on March 16, 2005, when he contacted the Department dispatcher to request a file number for the search.  Graham Deposition, at 62, 64-65.

Washington stated that he did not place any trash on the curb that day.  Washington Deposition, at 194.  The records of the trash hauling company contained a notation that the trash haulers were at the Residence at 9:55 a.m. that day, but no trash was picked up from that property.  Plaintiffs' Exhibit C, Waste Management Customer Internal Comments for Larry Washington.  That trash hauling company made such a notation on

its records if: (1) no trash can was placed at the curb to be picked up, or (2) trash cans were placed at the curb, but the cans were empty.  Plaintiffs' Exhibit B, Deposition of Jeff Mjelde, at 13.

Graham and Carpenter stated that they found the following in the trash taken from the Residence on March 16, 2005: (1) mail addressed to Washington; (2) a handwritten note with amounts of money written on it, starting with a sum of $30,000.00; (3) two quart-sized plastic baggies with the corners cut off and one whole plastic baggie; (4) a small amount of residue on the bags; (5) a Starcrest dry cleaning receipt with the name of B. Hollywood on it; and (6) a handwritten construction plan with the name of Hollywood on it.  Graham Deposition, Deposition Exhibit 2, Complaint for Search Warrant, attached Affidavit of James Graham (Affidavit).  Later tests showed that Washington's fingerprints were on some of the found items. Defendants' Exhibit 3, Deposition of La Vonne Odele, at 30-33. Washington admitted that the items belonged to him, but denied that he placed the trash on the curb that day.  He did not know how the Defendants came into possession of the items.  Washington Deposition, at 128.

Carpenter stated that he field-tested the residue in the plastic baggies.

Carpenter stated that the tests were positive for cocaine.  <u>Carpenter</u> <u>Deposition</u>, at 87.  The Illinois State Police laboratory later ran tests on the baggies.  Those tests were negative for cocaine.  <u>Plaintiffs' Exhibits</u>, Exhibit D, <u>Illinois State Police Forensic Laboratory Report dated June 15, 2006</u>.  An Illinois State Police lab technician stated that the field test may have removed the drug residue from the bags.  <u>Defendant Carpenter's Reply to</u> <u>Plaintiffs' Memorandum of Law in Response to Defendant Carpenter's</u> <u>Motion for Summary Judgment (d/e 200 Attachment 1) (Carpenter Reply)</u>, Exhibit B, <u>Deposition of Amy Parker</u>, at 43-46, 51.

Graham then prepared a request for a search warrant for the Residence, along with a supporting Affidavit.  <u>Affidavit</u>.  The Affidavit contained the following information: (1) a summary of Washington's criminal record and gang affiliation; (2) a statement that two automobiles parked at the Residence were registered to Washington; (3) a list of the items that Graham and Carpenter state that they found in the trash from the Residence; (4) a statement that the baggies tested positive for cocaine; and (5) a statement that a computer check indicated that Jenkins had a drivers license with 1429 Guemes listed on it.  <u>Id.</u>  Neither Graham nor Carpenter, however, recalled conducting a computer check regarding

Jenkins' drivers license, and Jenkins stated that her drivers license did not list 1429 Guemes on it. <u>Carpenter Deposition</u>, at 91-93, 108-09; <u>Graham Deposition</u>, at 46, 50.[2] An Illinois Associate Circuit Judge reviewed the Affidavit and issued the warrant.

On March 17, 2005, Defendants Graham, Carpenter, Welsh, and Wooldridge searched the Residence pursuant to the warrant. The search was conducted between 6:43 a.m. and 11:53 a.m. <u>Graham Deposition</u>, at 103. The Plaintiffs were also present, along with Washington's minor son, and Sangamon County, Illinois, Assistant State's Attorney Randy Blue. Other law enforcement officers participated in the search, including Alcohol, Tobacco, and Firearms (ATF) Agents Tom Dart, John Carpenter, and Pete Pappas; and Sangamon County, Illinois, Deputy Brian Stapleton, with his dog that was trained to detect drugs.

The officers stated that, during the search, Washington fidgeted whenever an officer walked near the kitchen pantry. <u>E.g.</u>, <u>Carpenter Deposition</u>, at 126-27. ATF Agent Pappas searched the pantry three or four

---

[2]At one point in his deposition, Graham stated that Carpenter checked the registration of the vehicles parked at the Residence, but later stated that he, Graham, checked the registration of the vehicles. <u>Graham Deposition</u>, at 50, 95-98. Carpenter stated that he did not check the registration of any vehicle. <u>Carpenter Deposition</u>, at 91-93.

times, but found nothing.  <u>John Carpenter Deposition</u>, at 60.  Deputy Stapleton also searched the pantry with his dog, but the dog did not alert on anything in the pantry.  <u>Graham Deposition</u>, at 128.

Toward the end of the search, someone directed officers to search the pantry again.  <u>John Carpenter Deposition</u>, at 101.  Wooldridge then searched the pantry and stated that he found cocaine in two graham cracker boxes on the top shelf.  According to Wooldridge, the bottoms of the boxes had been opened, the cocaine had been placed in the center of the boxes, between packets of graham crackers, and then the bottom of the boxes had been resealed with glue.  <u>Defendants' Exhibit 6</u>, <u>Deposition of J.T. Wooldridge (Wooldridge Deposition)</u>, at 43-47, 56-58.  Jenkins' fingerprints were found on one of the graham cracker boxes.  <u>Defendants' Exhibits</u>, Exhibit 10, <u>Deposition of Tracy Sulwer</u>, at 26-27.  Washington was arrested and charged with manufacture/delivery of a controlled substance.  He was released on bond.

Washington denied that any cocaine was in the Residence before the search occurred.  <u>Washington Deposition</u>, at 130, 133, 135.  The Plaintiffs believed that the Defendants planted the cocaine in the house.  The Plaintiffs did not identify a reason why the Defendants would have planted

cocaine in the Residence.  <u>Washington Deposition</u>, at 137; <u>Defendants'</u>
<u>Exhibit 11b</u>, <u>November 17, 2008 Deposition of Jennifer Jenkins</u>, at 24.

On March 21, 2005, Graham prepared a report on the search of
Washington's trash on March 16, 2005.  <u>Graham Deposition</u>, at 59-60.  On
October 18, 2005, the return on the execution of the warrant was filed.
This was seven months after the search.  <u>Graham Deposition</u>, at 102-03.
According to Department policy, the return should have been filed
promptly.

Thirteen months later, on April 26, 2006, the Department's Director
of Human Relations Lawrence W. Selinger issued a letter to Defendant
Davis granting Davis' request for medical leave.  The letter stated in part:

> You have notified us of your need to take family medical leave
> due to a health condition that makes you unable to perform the
> essential functions of your job.  Under the federal Family and
> Medical Leave Act (FMLA), . . . you may take up to twelve (12)
> weeks of family medical leave in a twelve (12) month period.
> You are eligible for leave under the FMLA, and the requested
> leave will count against your annual family medical leave
> entitlement.
> . . . .Your FMLA leave began on April 17, 2006 and you are
> eligible for FMLA leave through July 17, 2006. . . .
> . . . .
> Prior to your return to work you must submit the attached job
> description to your physician and obtain a written release from
> him/her stating that you are able to perform the essential
> functions of your job.  Your return to work may be delayed until

it is provided to your supervisor.

<u>Defendants' Exhibits</u>, Exhibit 15, <u>Deposition of Donald Kliment,</u> <u>Deposition Exhibit 38, Letter dated April 26, 2006</u>.  Davis turned in his badge and service weapon when he went on medical leave.  According to Davis and Kliment, Davis could not exercise any authority as a police officer while he was on medical leave.   <u>Defendants' Exhibit 14, Deposition of</u> <u>Rickey Davis (Davis Deposition)</u>, at 110-12; <u>Kliment Deposition</u>, at 69-75.

On May 22, 2006, Washington and Davis were both at Gold's Gym in Springfield, Illinois.  Washington was still on bond on the charges pending from the March 17, 2005, search and arrest.  Davis was still on medical leave from the Department.  Davis claimed that Washington threatened him at that time.  Washington denied that he made any threats to Davis.  Davis reported the threat to the Department.  Washington was arrested within days of the encounter with Davis.  On June 5, 2006, after a hearing in Sangamon County, Illinois, Circuit Court, Washington's bond was increased as a result of the incident.

Davis' medical leave was extended on July 17, 2006, and again on October 19, 2006.  Kliment wrote Davis a memorandum each time confirming the extensions of his leave.  Each of those memoranda stated

that Davis had no authority to act as a Department police officer while on medical leave.   <u>Kliment Deposition</u>, <u>Collective Deposition Exhibit 39,</u> <u>Memoranda from Kliment to Davis dated July 24, 2006, and October 19,</u> <u>2006</u>.

The Plaintiffs have presented additional evidence to show that: (1) Graham and Carpenter previously included false statements in affidavits for warrants; (2) the City and Rouse failed to supervise Graham and Carpenter, and (3) Graham, Carpenter, and Welsh were not credible.  Most of the tendered evidence is hearsay and cannot be considered at summary judgment. <u>Fed. R. Civ. P.</u> 56(e).  Some of the evidence, however, consisted of statements by a Defendant based on personal knowledge.   Those statements are admissible.  Others were admissions by a Defendant.  Such admissions are competent evidence against the Defendant who made the admission.  <u>Fed. R. Evid.</u> 801(d).  The statements by Chief Kliment and Deputy Chief Rouse could be competent evidence against the City.  <u>Fed. R.</u> <u>Evid.</u> 801(d)(2).  The Plaintiffs also presented judicial findings in a previous case.  <u>United States v. Whitley</u>, 249 F.3d 614 (7th Cir. 2001).  The Court can take judicial notice of those findings.

The admissible evidence shows the following:

1.    Chief Kliment believed that the Department, and in particular Rouse and the Sergeants and Lieutenants in Criminal Investigations, did not adequately supervise Graham and Carpenter. <u>Kliment Deposition</u>, at 31-32, 48-49.

2.    Rouse stated that he had to discipline, or write up, Graham several times.  <u>Plaintiffs' Exhibit G</u>, <u>Deposition of William Rouse (Rouse Deposition)</u>, at 21.  Rouse identified one incident in which Graham found a large sum of money during a search of a residence.  Graham violated policy by failing to bring the money to the station immediately for booking. Instead, Graham went to lunch first; he locked the funds in the trunk of his vehicle during lunch. <u>Id.</u> Rouse did not identify any other specific instances in which he disciplined Graham.  Rouse stated that he wrote up Carpenter once because Carpenter was involved in a disturbance at a local tavern. <u>Id.</u>, at 22.

3.    Rouse opined that Graham and Carpenter were only loosely following the Department's general order regarding search warrant affidavits.  Affidavits that relied on confidential sources were required to identify the source by number.  He believed that Graham and Carpenter were using Crime Stoppers tip numbers for confidential source numbers.

Crime Stoppers was a program in which individuals called to provide anonymous tips.  See Graham Deposition, at 38.  Graham and Carpenter's practice of using Crime Stoppers numbers for confidential source numbers was improper.  Rouse Deposition, at 24-25.

4.     On June 30, 1999, Graham, Carpenter, and Welsh were involved in the search of two motel rooms at the Stevenson Inn in Springfield, Illinois.  The officers secured a warrant to search the room occupied by Huey Whitley.  The warrant was based on an Affidavit which recited that Carpenter conducted a traffic stop of a woman after she left Whitley's room.  The Affidavit was prepared and signed by Welsh.  The Affidavit recited that the woman possessed marijuana, and the woman stated that she had purchased the marijuana from Whitley.  The statement that she purchased marijuana from Whitley was false.  United States v. Whitley, 249 F.3d at 616-17.  The Seventh Circuit overturned Whitley's conviction based on the false Affidavit.  Id., at 623-24.

The other motel room was occupied by Marcellus Mitchum.  The officers did not have a warrant to search his room.  Officer Welsh testified that Mitchum opened the door to the room voluntarily and allowed the officers to search.  Mitchum denied that he opened the door voluntarily.  He

claimed that the officers used a key to enter the room.  The motel records supported Mitchum's version of events rather than Welsh's.  Id., at 619. The Court credited Mitchum's version of the event.  The evidence found in the search of Mitchum's room was suppressed. Id., at 620.

5.      In June 1999, Carpenter recited in a warrant affidavit that a male informant provided information for the warrant.  In fact, the informant was a woman.  Carpenter Deposition, at 57, 160-61.  Carpenter told Illinois State Police investigator Anthony McClure that he lied about the gender of the informant because she was the suspect's sister, and Carpenter wanted to protect her identity.  Plaintiffs' Exhibit H, Deposition of Anthony McClure (McClure Deposition), at 28-29, 51.

6.      In another instance, Graham and Carpenter stated that they conducted a trash rip that resulted in a search warrant of the residence of an individual named Rico Faine.  Faine was charged, but the charges were dropped when the state trial court suppressed the evidence from the search. The trial court found that Faine did not leave any trash out on the curb on the day of the trash rip.  Graham Deposition, at 140, 149-50; Carpenter Deposition, at 149-51; McClure Deposition, at 49-50.

7.      In December 2005, Graham went to Mississippi to pick up a

homicide suspect.  During the trip, Graham was found in bed with a woman that Graham had questioned earlier that day.  Graham admitted to being in bed with the suspect.  He stated that they were clothed and that he did not have intercourse with the woman.  McClure Deposition, at 35-36; Graham Deposition, at 166.

8.     Carpenter has also admitted helping two informants.  In one case, Carpenter asked a local charity to fabricate service hours for an informant used by Carpenter.  The informant had been sentenced to 500 hours of community service, and Carpenter tried to help the informant get out of performing the service time.  Carpenter Deposition, at 157-58.  In another situation, Carpenter confiscated a weapon from an informant.  The informant was subsequently convicted in a federal proceeding.  Carpenter refused to testify at the federal sentencing hearing regarding the weapon's incident.  Carpenter stated that he gave his word to the informant and kept that promise.  Carpenter Deposition, at 154.

9.     In the murder trial of a defendant named Grimm, Graham had in his personal file a copy of a witness interview report that had not been turned over to the defense.  Graham believed that the prosecuting attorney had a copy of the report, but the prosecutor did not.  Graham provided the

defense with a copy of the interview report during the trial.   Graham Deposition, at 151-53.

## ANALYSIS

The Plaintiffs bring four claims against the Defendants.  The Plaintiffs claim in Count I that Graham, Carpenter, Wooldridge, and Welsh violated their rights by fabricating the false Affidavit to secure the warrant to search the Residence.  The Plaintiffs claim that the trash rip search did not occur, and thus, the supposed field test of the non-existent baggies also did not happen.  Complaint (d/e 1), at 1.  The Plaintiffs claim in Count II that Carpenter, Graham, Welsh, and Wooldridge conspired to plant the cocaine that was supposedly found at the Residence in order to arrest Washington. Id., at 3.  Washington claims in Count IV that Davis lied about the incident in May 2006 in order to get Washington arrested again.  Id., at 6.  Last, the Plaintiffs claim in Count III that the City had a custom or policy of authorizing false affidavits and illegal conspiracies to plant evidence during searches, such as the events surrounding the March 17, 2005, search of the Residence.  Id., at 4.

The Plaintiffs named Rouse in his official capacity in Count III.  The

Plaintiffs have agreed to dismiss this claim against Rouse voluntarily.[3] Plaintiffs' Memorandum of Law in Response to Defendants City of Springfield, Welsh, Wooldridge, and Rouse's Motion for Summary Judgment (d/e 195), at 7. The Plaintiffs only sued Rouse in his official capacity. As such, the claim was a claim against the City, and so, was duplicative of the claim brought against the City. See Tabor v. City of Chicago, 10 F.Supp.2d 988, 991 (N.D. Ill. 1998). Thus, the claims against Rouse are dismissed.

The remaining Defendants now seek summary judgment. At summary judgment, the Defendants must present evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to the Plaintiffs. Any doubt as to the existence of a genuine issue for trial must be resolved against the Defendants. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a Defendant has met his or its burden, the Plaintiffs must present evidence to show that issues of fact remain with respect to an issue essential to their

---

[3]The Plaintiffs previously voluntarily dismissed their Count III claims against Davis. Text Order entered June 20, 2007.

case, and on which they will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The Court will address the claims against the individual Defendants, and then the claims against the City.

I.   CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

   A.   Count I -- False Affidavit Claim

Fabricating a trash rip search and field drug test results, and then lying about those results on an affidavit to secure a search warrant, clearly would violate the Fourth Amendment.  See Franks v. Delaware, 438 U.S. 154, 165 (1978).  Carpenter and Graham stated that they conducted the trash rip search at the Residence and found parts of plastic baggies that tested positive for cocaine.  Graham recited those averments in the Affidavit. Washington and Jenkins deny that the Affidavit was truthful; they state that they did not even put the trash out that day.  At summary judgment, however, the Plaintiffs cannot simply rely on their personal denials of the Defendants' assertions.  The Plaintiffs must present some affirmative evidence to demonstrate an issue of fact exists.  Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003).

In this case, the Plaintiffs have presented affirmative evidence to

create an issue of fact regarding whether Carpenter and Graham fabricated the search, the field test, and the Affidavit.  The notation on the records of the trash hauling company could be viewed as support for the Plaintiffs' statements that they did not put any trash out on March 16, 2005.  The Illinois State Police laboratory test results also indicated that the baggies, which were claimed to have been found in the trash rip, did not contain cocaine.  When read in the light most favorable to the Plaintiffs, this evidence is sufficient to create an issue of fact regarding whether the trash rip occurred, whether the field test results were true and whether the Affidavit was true.  In addition, the evidence, read favorably to the Plaintiffs, indicates that Graham made at least one other false statement in the Affidavit.  Graham stated under oath that the address of the Residence was listed on Jenkins' drivers license; however, neither Graham nor Carpenter recalled checking Jenkins' drivers license registration, and Jenkins testified that the Residence was not listed on her license.

The Defendants presented testimony from a State Police lab technician to offer a possible explanation of the lack of any residue on the baggies.  The technician's testimony, however, was not conclusive; she offered a possible explanation.  The Defendants also argue that the trash

19

hauling company made note of the lack of any trash at the Residence on March 16, 2005, because Graham had already removed the trash. This argument is an alternate interpretation of the evidence, but it is not conclusive. The Court must view the evidence in the light most favorable to the Plaintiffs at this juncture. When read in that light, there is an issue of fact regarding whether the Affidavit was truthful.

B.     Count II -- The Planted Drugs and False Arrest Claim

Planting evidence to establish probable cause, such as planting drugs in the Residence, also clearly violates the Fourth Amendment. E.g., Smith v. City of Chicago, 913 F.2d 469, 472 (7th Cir. 1990). Again, when read in the light most favorable to the Plaintiffs, the evidence has created an issue of fact regarding whether one or more officers planted the cocaine in the Residence. ATF Agent Pappas searched the pantry three or four times, but found nothing. Sangamon County Deputy Stapleton and his drug detecting dog searched and found nothing. This evidence supports an inference that there were no drugs in the pantry at that point in time. If so, some other officer planted the cocaine later during the search. This evidence is enough to create an issue of fact.

The Defendants presented evidence that the dog cannot smell cocaine

that is six feet off of the floor.  <u>Carpenter Reply</u>, Exhibit C, <u>Affidavit of</u> <u>Brian Stapleton</u>, ¶ 12.  This evidence, however, was not conclusive.  The Court cannot determine whether the top shelf was more than six feet above the floor.  The Court must view the evidence in the light most favorable to the Plaintiffs at this juncture.  When read in that light, there is an issue of fact regarding whether the cocaine was planted.

     C.    <u>Count IV -- May 2006 Gold's Gym Incident</u>

The evidence fails to show that Davis violated Washington's rights in the Gold's Gym incident.  When read in the light most favorable to the Plaintiffs, the evidence shows that Davis may have lied about his encounter with Washington which resulted in Washington temporarily losing his freedom from pretrial detention.  Plaintiffs, however, must establish that Davis acted under color of law to establish a claim under § 1983.  Davis was on medical leave.  While on medical leave, Davis had no authority to act as a police officer.  In such situations, the officer on medical leave is not a state actor.  <u>Gibson v. City of Chicago</u>, 910 F.2d 1510, 1517-18 (7th Cir. 1990). Davis, therefore, did not act under color of law.  Davis is entitled to summary judgment.

The Plaintiffs cite numerous cases that state that off-duty officers still

act under color of law even when off-duty.  E.g., Swiecicki v. Delgado, 463 F.3d 489, 496 (6th Cir. 2006).  Those officers in those cases, however, were not relieved of duty.  They still had the authority to act as a police officer.  Davis was relieved of duty while on medical leave.  He had no authority to act as a police officer.  He, therefore, did not act under color of law.  Davis is entitled to summary judgment.

D.   Personal Involvement of Defendant Officers

A person is only liable under § 1983 if he personally participated in the wrongful conduct.  E.g., Campbell v. Chappelow, 95 F.3d 576, 579 (7th Cir. 1996).  The Plaintiffs must present evidence that each individual Defendant personally participated in the wrongful conduct.  The evidence, when read favorably to the Plaintiffs, indicates that: (1) Graham and Carpenter personally participated in fabricating a trash rip search and field test results; (2) Graham fabricated the Affidavit that falsely stated that they found cocaine residue in the Plaintiffs' trash; and (3) an officer or officers planted cocaine in the pantry after ATF Agent Pappas and Deputy Stapleton's drug dog searched the pantry.  If jurors conclude that Carpenter and Graham fabricated the field test results and the Affidavit to get the warrant, they could also infer that Graham and Carpenter knew that cocaine

would be planted and found in the Residence.  The evidence, when read favorably to the Plaintiffs, supports the inference that Graham and Carpenter personally participated in both fabricating the field test results and the Affidavit, and in planting the cocaine.

No evidence connects either Wooldridge or Welsh to the claims in Count I.  They did not participate in any investigation of Washington before the judge issued the search warrant for the Residence on March 16, 2005.  No evidence ties either of them to the trash rip search that Graham and Carpenter say they conducted.  Wooldridge and Welsh are, thus, entitled to summary judgment on Count I.  Furthermore, no evidence ties Welsh to the planting of the cocaine.  He was present, but he did not find the cocaine.  He did not search the pantry at any time.  Welsh is entitled to summary judgment on Count II.

Wooldridge found the cocaine.  This fact provides some circumstantial evidence that he was involved in the alleged planting of the drugs since he chose to open the graham cracker boxes where the drugs were located.  When viewed in the light most favorable to the Plaintiffs, this is sufficient to create an issue of fact regarding his involvement.  Summary judgment, therefore, is denied for Defendant Wooldridge with respect to the claim that

the Defendants planted the cocaine in the Residence in order to arrest Washington falsely.

     E.     <u>Qualified Immunity</u>

Graham, Carpenter, and Wooldridge all assert the affirmative defense of qualified immunity.  Once a defendant has raised the defense of qualified immunity, the plaintiff must demonstrate that the defendant violated a clearly established right.  <u>Forman v. Richmond Police Dept.</u>, 104 F.3d 950, 957-58 (7th Cir. 1997).  A defendant is also entitled to an interlocutory appeal on the issue before proceeding to trial.  <u>Ashcroft v. Iqbal</u>, __ U.S.__, 2009 WL 1361536, at *9 (May 18, 2009).  When read favorably to the Plaintiffs, the evidence could support the conclusions that: (1) Graham and Carpenter fabricated a trash rip and the field test results to secure a warrant; (2) Graham lied on the Affidavit to get the warrant; and (3) Graham, Carpenter and Wooldridge conspired to plant cocaine at the Residence during the search to justify arresting Washington.  If so, then the three officers violated the clearly established constitutional Fourth Amendment principles to be free from unreasonable searches and seizures.  <u>Franks</u>, 438 U.S. at 165; <u>Smith</u>, 913 F.2d at 472.  The Defendants, thus, are not entitled to summary judgment on their claims of qualified immunity.

II.     COUNT III -- THE CLAIM AGAINST THE CITY

Plaintiffs seek to hold the City liable for the claimed conduct of Graham, Carpenter, and Wooldridge.   Section 1983 generally imposes liability on the individual who violated the plaintiff's rights.   Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978); see Auriemma v. Rice, 957 F.2d 397 (7th Cir. 1992).  Liability will only be imposed on a municipality if the municipality was directly culpable for the actions.  A municipality is culpable for the actions of its employees if the actions were taken pursuant to official City policy or if the actions were taken as part of a custom or practice of the City that existed at the time of the incident.  Calusinski v. Kruger, 24 F.3d 931, 936 (7th Cir. 1994).  To be a custom or practice, the actions must be so wide-spread and pervasive that they amount to a practice that has the force of law.  Gable v. City of Chicago, 296 F.3d 531, 537 (7th Cir. 2002); Sims v. Mulcahy, 902 F.2d 524, 542 (7th Cir. 1990).  To have the force of law, City policymakers must know of the custom or practice and be deliberately indifferent to the known or obvious consequences of the custom or practice.  Gable, 296 F.3d at 537-38.  A municipality may also be liable if the act is caused by a person with final policymaking authority for the municipality.  Killinger v. Johnson,

389 F.3d 765, 771 (7th Cir. 2004).

Persons with final policymaking authority are those individuals who have the authority to adopt rules and conduct government relevant to this case. Killinger, 389 F.3d at 771; Auriemma, 957 F.2d at 399-401. The identity of persons who have final policymaking authority is determined by state and local law. Killinger, 389 F.3d at 771-72.

Plaintiffs must present evidence of either: (1) a custom or practice, or (2) wrongful actions by a person with final policymaking authority.[4] Plaintiffs have failed to present evidence of either. Plaintiffs assert that Rouse and Kliment were on notice that Carpenter and Graham consistently violated the Department's rules and regulations, but did nothing about it. Thus, the Plaintiffs argue, Rouse and Kliment were deliberately indifferent to the obvious consequences of Graham and Carpenter's actions.

The Plaintiffs, however, failed to show that either Rouse or Kliment had final policymaking authority for the City. The Plaintiffs fail to identify any state or local law that authorized either of these men to make final policy for the City. See Killinger, 389 F.3d at 772 ("Plaintiff's municipal

---

[4]Plaintiffs do not attempt to identify an official policy to fabricate affidavits for warrants or plant drugs.

liability theory fails because he has not identified any state or local positive law, or custom having the force of law, that grants either the chief [of police] or the mayor authority to adopt rules that are relevant to this case."); Auriemma, 957 F.2d at 401 (Superintendent of Police in Chicago was not final policymaker because he only had authority to carry out policy, rather than make policy). The Plaintiffs, thus, fail to present evidence that the City's final policymakers were on notice of any improper conduct by either Graham or Carpenter. Without such evidence, Plaintiffs fail to present evidence of either a custom or practice, or a wrongful act by a person with final policymaking authority.

Even if Rouse and Kliment were final policymakers, the Plaintiffs also failed to present competent evidence that either Rouse or Kliment were on notice that Graham and Carpenter had a practice of either fabricating affidavits for warrants or planting evidence. The competent evidence showed two or three incidents in which Graham or Carpenter made a false statement in connection with an affidavit or during testimony in a criminal proceeding. Two or three incidents over several years are too few to provide notice of a custom or practice. Gable, 296 F.3d at 538.

The Plaintiffs argue that the evidence showed that Rouse and Kliment

27

knew that Graham and Carpenter violated Department policies, such as the Department policy against trash rips and the Department's policy against using Crime Stopper numbers as informant identification numbers. Violation of these policies, however, did not implicate a violation of a constitutional right. Trash rips, if done properly, are constitutional. U.S. v. Redmon, 138 F.3d 1109, 1112-13 (7th Cir. 1998). Affiants in warrant applications are not obligated to identify informants if the affidavit is sufficient under the totality of the circumstances. See Illinois v. Gates, 462 U.S. 213, 238-39 (1983). Thus, this evidence did not show that Rouse and Kliment were on notice that Graham and Carpenter were violating citizens' constitutional rights. See Thompson v. City of Chicago, 472 F.3d 444, 454-55 (7th Cir. 2006). The Plaintiffs have failed to show that Rouse and Kliment had final policymaking authority for the City, and have failed to show that Rouse and Kliment were on notice of a widespread practice of lying on affidavits for warrants or planting evidence. The City is entitled to summary judgment on the municipal liability claims.

THEREFORE, Defendant Paul Carpenter's Motion for Summary Judgment (d/e 174) is DENIED; Defendant James Graham's Motion for Summary Judgment (d/e 175) is DENIED; Defendants City of Springfield,

Welsh, Wooldridge, and Rouse's Motion for Summary Judgment (d/e 172) is ALLOWED in part and DENIED in part; and Defendant Rickey Davis' Motion for Summary Judgment (d/e 176) is ALLOWED. Summary judgment is entered in favor of Defendants Rickey Davis, S. Welsh and the City of Springfield and against Plaintiffs Larry M. Washington and Jennifer A. Jenkins. Partial summary judgment is entered in favor of Defendant J.T. Wooldridge and against Plaintiffs Larry M. Washington and Jennifer A. Jenkins on Count I of the Complaint. The claim against Defendant Deputy Chief William Rouse is dismissed with prejudice. Defendants Davis, Welsh, Rouse, and the City of Springfield are dismissed from this case.

IT IS THEREFORE SO ORDERED.

ENTER:   June 11, 2009

   FOR THE COURT:

       _____ s/  Jeanne E. Scott _____
         JEANNE E. SCOTT
       UNITED STATES DISTRICT JUDGE